UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                  :
UNITED STATES OF AMERICA                          :
                                                  :
            -v.-                                   :        S4 23 Cr. 490 (SHS)
                                                  :
ROBERT MENENDEZ,                                  :
NADINE MENENDEZ,                                  :
        a/k/a "Nadine Arslanian,"                 :
WAEL HANA,                                        :
        a/k/a "Will Hana," and                    :
FRED DAIBES,                                      :
                                                  :
                    Defendants.                   :
                                                  :
----------------------------------------------------------------x


**THE GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANTS' MOTIONS _IN LIMINE_**



                            DAMIAN WILLIAMS
                            United States Attorney


Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys
- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................ 1

APPLICABLE LAW ........................................................................................... 1

I.    Federal Rules of Evidence 401, 402, and 403 ........................................... 1

II.   Federal Rule of Evidence 404(b) ............................................................. 3

ARGUMENT ...................................................................................................... 5

I.    Menendez's and Hana's Motions To Preclude Evidence Should Be Rejected ................. 5

A.   Cash Found in Menendez's House is Admissible ......................................... 5

B.   Photographs of Luxury Watches Offered As Bribes to Menendez Are Admissible ......... 13

C.   Menendez's Financial Disclosure Forms Are Admissible ............................... 15

D.   Hana's Lack of Registration Under the Foreign Agents Registration Act Is Admissible . 21

E.   Menendez's Motion to Preclude Certain Evidence Concerning Business Benefits Obtained from Menendez's Official Acts Is Moot ....................................................... 22

F.   Evidence of Certain Fundraisers Is Admissible ........................................ 24

G.   Evidence Related To Menendez's Tax Returns Is Admissible ........................... 26

II.   The Defendants' Motions to Preclude Evidence of Their Financial Circumstances and Financial Consumption Patterns Should Be Rejected .................................... 28

III. Menendez's and Nadine Menendez's Motions to Preclude Evidence Regarding Use of Her Consulting Company to Collect Payments for Menendez's Influence on Business Matters Should Be Rejected .......................................................................... 32

A.   Factual Background of Fusion ............................................................. 32

B.   Discussion .................................................................................. 33

IV. The Motion to Exclude Menendez's Prior Case is Moot ................................. 36

CONCLUSION ................................................................................................. 37

The Government respectfully submits this omnibus memorandum of law in opposition to the motions *in limine* of defendants Robert Menendez ("Menendez"), Nadine Menendez ("Nadine Menendez"), and Wael Hana.  (Dkts. 284, 289, 290, 292, 293.)[1]  For the reasons set forth below, the defendants' motions should be denied.

## PRELIMINARY STATEMENT

All or nearly all of the defendants' arguments fail because what weight to give to evidence, and what inferences to draw from evidence, is for the jury.  *See, e.g., Goldsby v. United States*, 160 U.S. 70, 76-77 (1895) ("the weight to be attached to the proof was a matter for the jury"). Labeling an inference "speculative" (Dkt. 290 at 1, 2, 3, 6, 7, 8, 9) does not change this fundamental rule or entitle a defendant to avoid the jury's consideration of competing inferences. *See, e.g., United States v. Mundy*, 539 F.3d 154, 157 (2d Cir. 2008) ("what conclusions should, or should not, be drawn from" evidence is for the jury); *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("[F]actors which make evidence less than conclusive affect only weight, not admissibility.").  To the extent their arguments are not defeated by this principle alone, they are otherwise meritless for the reasons explained below.  The defendants' motions *in limine* should be denied in their entirety.

## APPLICABLE LAW

### I.  Federal Rules of Evidence 401, 402, and 403

Under Federal Rule of Evidence 401, evidence is "relevant" if it "has *any tendency* to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action."  Fed. R. Evid. 401 (emphasis added).  "The fact to which the evidence is directed need not be in dispute."  *Old Chief v. United States*, 519 U.S. 172, 179

---

[1] Defendant Fred Daibes did not file any motions *in limine*.

(1997) (quoting Fed. R. Evid. 401 advisory committee's note); *see also* Fed. R. Evid. 401 advisory committee's note ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding. . . . A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this helpful evidence, or at least the raising of endless questions over its admission."). To be relevant, evidence need not constitute conclusive proof of a fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (internal quotation marks and citation omitted).

Federal Rule of Evidence 402, in turn, provides that "relevant evidence is admissible," unless the Constitution, a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise. This is a very low standard. *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("so long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry" (citing *United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (Friendly, J.))).

Otherwise admissible evidence is subject to preclusion under Federal Rule of Evidence 403 only if its probative value is "substantially outweighed" by the danger of, among other things, unfair prejudice or misleading or confusing the jury. Fed. R. Evid. 403. Evidence is not excludable, however, simply because it is "prejudicial." As the Second Circuit has explained:

> To be sure, all evidence incriminating a defendant is, in one sense
> of the term, "prejudicial" to him: that is, it does harm to him. In that
> sense, the more pertinent evidence is, the more prejudicial it is.
> What "prejudice" as used in Rule 403 means is that the admission

2

is, as the rule itself literally requires, "unfair" rather than "harmful."

*United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986); *see also, e.g.*, *Oregon v. Kennedy*, 456 U.S. 667, 674 (1982) ("Every act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt"); *United States v. Vargas*, 702 F. Supp. 70, 72-73 (S.D.N.Y. 1988) (the fact "that evidence may be 'damning' does not render it inadmissible." (citing *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972))).

In short, "[b]ecause virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original).   Accordingly, to warrant exclusion of evidence as on this ground, a defendant must be able to identify "'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)); *United States v. Gilliam*, 994 F.2d 97, 100 (2d Cir. 1993) (same).

## II.   Federal Rule of Evidence 404(b)

Rule 404(b) allows for the admission of uncharged crimes, wrongs, or other acts for purposes other than proving criminal propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Fed. R. Evid. 404(b).   The Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity."   *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (internal quotation marks omitted).   Applying this approach, the Second Circuit has routinely approved of the admission of "other acts" evidence with respect to

the issues of knowledge, intent, and/or motive. *See, e.g.*, *United States v. Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1995); *United States v. Meyerson*, 18 F.3d 153, 166-67 (2d Cir. 1994). Where the defendant claims his or her conduct has an innocent explanation, the admission of such evidence of prior acts is particularly appropriate. *See, e.g.*, *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

A defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded that element of the offenses with which he or she is charged. *See, e.g.*, *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *see also United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the Government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b). *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994). Where evidence is offered for a proper purpose under Rule 404(b), it may only be excluded if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *Zackson*, 12 F.3d at 1182. While any evidence, including evidence offered pursuant to Rule 404(b), is subject to the balancing test set forth in Rule 403, "other act" evidence that is neither "more sensational [n]or disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *United States v. Paulino*, 445 F.3d at 223. Moreover, evidence properly

admissible under Rule 404(b) is not unduly prejudicial so long as the court gives a limiting instruction to the jury explaining the purpose for the evidence. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *United States v. Rosa*, 11 F.3d 315, 333-34 (2d Cir. 1993).

## ARGUMENT

### I.    Menendez's and Hana's Motions to Preclude Evidence Should Be Rejected

Menendez and Hana each seek to prevent the jury from learning about plainly relevant evidence, including large amounts of cash, luxury watches offered to Menendez during the charged scheme, concealment of the bribes, and the rewards reaped by those who paid Menendez bribes, as well as other direct evidence of the crimes charged in the Indictment. The Court should decline the defendants' invitation to sit as trier of fact and weigh the inferences to be drawn from this evidence.

### A.  <u>Cash Found in Menendez's House is Admissible</u>

During the June 2022 search of Menendez's and Nadine Menendez's home in New Jersey, large amounts of valuable items were seized, including two one-kilogram gold bars, eleven one-ounce gold bars, and approximately $485,000 in cash stashed throughout the house. All of the gold bars and much of the cash were found in a bedroom closet, and over $200,000 of the cash was found in such locations as a duffel bag in an office, a bag on a shelf above a coat rack in the basement, in the pockets of men's jackets hanging on the coat rack, and stuffed into footwear under jackets. In addition, more than $70,000 in cash was found in the search of a safe deposit box maintained by Nadine Menendez the same day. The Government expects to prove at trial that all of the gold bars are linked by serial number and refiner information to either Daibes (who provided both of the one-kilogram bars and nine of the eleven one-ounce bars) or to Hana (who provided

the other two one-ounce bars).[2]  The Government expects to prove at trial that at least ten of the envelopes of cash, containing over $80,000, had Daibes's fingerprints or DNA either on the envelopes themselves or on tape affixed to the envelopes.

Menendez acknowledges the relevance of such items to the extent they originated from Daibes, and does not seek preclusion of such evidence.  (*See, e.g.*, Dkt. No. 290 at 3 ("Senator Menendez does not here seek to preclude the government from presenting items of value purportedly bearing Fred Daibes' fingerprints . . . or seized gold bars that the government alleges originated from Daibes").)  However, he claims that "other than a single envelope with some cash in it that purportedly bears Daibes's fingerprint, there is no evidence linking any of the other cash, jewelry, or valuables seized from the Senator's home to any alleged co-conspirator" (*id.*), and that all evidence of such items must therefore be precluded.[3]  That is wrong both factually and legally. Menendez is not entitled for the jury to be presented with an artificially constricted view of reality that he appears to believe favors him.

*First*, it was not a "single envelope with some cash" but at least ten envelopes containing over $80,000 in cash seized from the Menendezes' home and safe deposit box on which Daibes's fingerprints and/or DNA have been identified.  (*See* Indictment ¶ 65 ("The search also revealed that the residence contained, among other things, hundreds of thousands of dollars of cash,

---

[2]  Both of the one-kilogram gold bars and nine of the eleven one-ounce gold bars have serial numbers matching those listed on an inventory, maintained by an employee of Daibes, of gold that was in Daibes's possession years before the charged offenses.  Both of the remaining one-ounce bars are, by their type and packaging (and as to one bar, by its serial number), from a set of 22 one-ounce bars that Hana purchased the day after a meeting between Menendez and Egyptian Official-5.

[3]  It is unclear whether Menendez is seeking preclusion of any of the gold bars.  As explained above, all of the gold bars are linked to Daibes or Hana.

including approximately ten envelopes of cash, with tens of thousands of dollars, bearing the fingerprints and/or DNA of DAIBES.").)[4]

*Second*, that DNA or fingerprints of Daibes, Hana, or another co-conspirator were not recovered from other envelopes of cash seized does not establish that those individuals did not handle that cash, but merely that such forensic evidence was not recovered—a point that the Government's noticed expert witnesses are expected to explain.

Moreover, the cash on which relevant fingerprints or DNA have not been identified—that is, the cash Menendez appears to seek to preclude—bears a number of indicia linking it to the scheme. As an initial matter, the fact that the cash forensically linked to Daibes amounted to a substantial proportion of a larger sum of cash stashed in various locations about the house strongly supports the inference that all of the cash is related. But not only was the remaining cash also stashed throughout the house, it was largely packaged and stored in a strikingly similar way to the cash that has been forensically linked to Daibes. For example, a number of the envelopes of cash bearing Daibes's fingerprints were found in a safe in a closet, which also contained a number of other envelopes of cash. Similarly, one of the envelopes of cash bearing Daibes's fingerprints was found in the pocket of a men's jacket, and that jacket also contained another envelope with cash, and was hanging near three other men's jackets, which also contained large sums of cash in their pockets (in envelopes or in rubber-banded wads).

Even beyond this strong circumstantial evidence, there are a number of specific indications that other cash, upon which Daibes's fingerprints were not found, was also connected to the

---

[4] Some of these envelopes also bear, in addition to Daibes's fingerprints or DNA, the fingerprints of Daibes's associates, such as his driver and one of his employees who went on to work for Hana's company IS EG Halal.

scheme. One envelope bore the fingerprints of one of Hana's associates. And some of the other seized cash not bearing Daibes's fingerprints was packaged with money bands indicating it had been withdrawn, at least $10,000 at a time, from a bank at which Menendez and Nadine Menendez had no known depository account—indicating that the money had been provided to them by another person.

It is thus not impermissibly "speculative" (*see, e.g.*, Dkt. 290 at 3) to ask the jury to infer that at least certain of the seized items that Menendez seeks to prevent the jury from knowing about were part of the charged scheme. Rather, it is a reasonable—indeed, well-supported—inference. To be sure, Menendez can disagree as to whether that inference should be drawn, but it is well within the province of the jury to decide for itself whether to do so or not to do so. *See, e.g.*, *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) ("a conviction may be based on circumstantial evidence and inferences based upon the evidence"); *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998) (the "government need not disprove every possible hypothesis of innocence" and that "the jury may properly base its verdict upon inferences from circumstantial evidence" (internal quotation marks omitted)).

In short, Menendez's argument concerning the lack of forensic or other direct evidence on some of the seized evidence goes to its weight, not its admissibility. That a defendant hopes the jury will accept his view of the evidence over the Government's view of the evidence is not a basis to prevent the jury from considering the evidence for itself. *See, e.g.*, *United States v. Burden*, 600 F.3d 204, 214 (2d Cir. 2010) ("any lack of corroboration is irrelevant because that speaks to the weight and not the sufficiency of the evidence"); *Schultz*, 333 F.3d at 416 ("Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which

make evidence less than conclusive affect only weight, not admissibility." (internal quotation marks and citation omitted)); *Mundy*, 539 F.3d at 157 ("what conclusions should, or should not, be drawn from" evidence is for the jury); *cf., e.g.*, *United States v. Badalamenti*, No. 84 Cr. 236 (PNL), 1985 WL 3539, at *1 (S.D.N.Y. Nov. 1, 1985) (Leval, J.) (rejecting motion to preclude evidence of conversations on the ground that the Government's interpretation was allegedly "false and deceptive"; explaining that "[w]hether the Government's suggested inferences or the defendant's are correct as to the significance of the conversations, is a question for the jury").

Contrary to Menendez's apparent suggestion, it is not the law, for very good reason, that evidence of cash is only admissible when there is essentially incontrovertible proof that the cash was proceeds of a crime. Such a proposition is inconsistent with the foregoing case law and the plain language of Rule 402. It is also inconsistent with the settled principle that jurors are permitted to and should use their common sense. *See, e.g.*, *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008) ("[J]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."). That principle would have no application if evidence were only admissible when the proof of guilt is incontrovertible. Put simply, jurors certainly can—if they choose—infer that when things of value are recovered from one bribery co-conspirator's home that are similar in kind, packaging, and/or location to other things of value recovered from the same home that had another co-conspirator's fingerprints on them, all those things of value were linked to the scheme. *See, e.g.*, *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) ("[T]he task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *cf., e.g.*, *United States v. Johnson*, 469 F. Supp. 3d 193, 210 (S.D.N.Y. 2019) (denying motion *in limine* seeking to exclude photographs of the defendant with large amounts of cash;

"[The defendant's] unsupported assertion that he has been lawfully employed, and has obtained judgments in civil suits, is not 'affirmative evidence' that the cash he is shown with was derived from a legitimate source.").

The cases cited by Menendez (Dkt. 290 at 4) are not to the contrary. He principally relies on *United States v. Avila*, No. 22-933, 2024 WL 413408 (2d Cir. Feb. 5, 2024), a summary order in a case in which the defendant posted photographs of cash with a caption that referenced drugs. In affirming conviction, and rejecting the defendant's argument that the photographs should have been precluded, the Second Circuit described the photographs' captions as "*bolster[ing]* their probative value," which the district court had described as "self-evident." *Id.* at *1, 2 (emphasis added). That statement in no way suggests that a caption or similar corroboration was necessary. In any event, to the extent that *Avila* could be read to stand for the proposition that cash, by itself and without more, is insufficiently probative to be admissible—which is a strained reading of the decision—there is a lot more here, as described above.

In *United States v. Cepeda*, also cited by Menendez (Dkt. 290 at 4-5), the Second Circuit overturned a narcotics conspiracy conviction that had been supported by evidence of drug paraphernalia, a small quantity of drugs consistent with personal use, and $1,151 in cash, but no evidence of any agreement with another person. 768 F.2d 1515, 1515-17 (2d Cir. 1985). The court also distinguished cases cited by the government regarding unexplained wealth because "[w]e do not think $1,151, even in an apartment at West 93rd Street, [is] indicative of very much," and the defendant had explained the money was from her job at a beauty shop and gambling winnings. *Id.* at 1518. Here, by comparison, the cash found in Menendez's house vastly exceeds

the modest sum (even in 1985) of $1,151, and some of it bears the fingerprints and/or DNA of the very individuals who are charged with bribing him.

The remainder of the cases that Menendez cites are summary judgment decisions from civil *in rem* forfeiture matters. They therefore are of little or no value here, but to the extent they have any persuasive value, they cut against Menendez. In *United States v. $7,877.61 U.S. Currency*, for example, the court denied summary judgment because the defendant had raised an issue of fact by asserting, through sworn affidavits, that the money at issue was not narcotics proceeds. No. 09-CV-6306P, 2015 WL 5719811, at *10 (W.D.N.Y. Sept. 30, 2015) ("While the trier of fact may ultimately conclude that the government's position concerning the source of the currency is credible, this Court cannot say at this stage that no reasonable trier of fact could credit [the claimant's] assertions."). And although summary judgment was not appropriate given the factual dispute, the court found that "[u]nquestionably, the presence of [narcotics paraphernalia] in the same residence as the currency supports the inference of a connection between the currency and narcotics trafficking." *Id.* at *8. So too here: the presence of gold bars and envelopes of cash provided by co-conspirators in a bribery scheme supports the inference of a connection between the other cash and the bribery scheme, particularly given the powerful corroboration described above. It is up to the trier of fact—here, the jury—to "weigh the strength of the evidence [and] make credibility determinations." *Id.* at *9 (internal quotation marks omitted). And in *United States v. U.S. Currency in Sum of One Hundred Eighty-Five Thousand Dollars ($185,000)*, 455 F. Supp. 2d 145, 155 (E.D.N.Y. 2006), the court *granted* summary judgment where hundreds of thousands of dollars had been seized on multiple occasions from vehicles in which the defendant was traveling yet the defendant had claimed only $2,200 in income and invoked his Fifth

11

Amendment rights when questioned about the money during a deposition. That the court found no issue of fact precluding summary judgment in that case says nothing about whether the jury here should be allowed to consider the evidence of cash found in Menendez's house.

There is also nothing unfairly prejudicial or inflammatory about the items Menendez challenges that "substantially" outweighs their relevance, and Menendez does not appear to argue to the contrary. Indeed, Menendez acknowledges that at least *some* of the gold bars and cash-filled envelopes are relevant and expressly does not seek to preclude them. Admission of more of substantially the same evidence, particularly given their intertwined and overlapping nature, is not unfair, much less inflammatory. *See, e.g.*, *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) ("evidence is unduly prejudicial only when it tends to have some adverse effect upon a defendant *beyond* tending to prove the fact or issue that justified its admission into evidence" (internal quotation marks and alterations omitted) (emphasis in original)); *cf. Roldan-Zapata*, 916 F.2d at 804 (challenged evidence "did not involve conduct any more sensational or disturbing than the [shootings] with which [the defendant] was charged.").

Nor is there any conceivable risk that the jury will misapprehend the purpose of this evidence or be unable to weigh whether the Government's view or another view is correct. On the contrary, as is apparent from his brief, Menendez is more than capable of arguing to the jury that no items found in his home came from a bribe payor. For example, Menendez can, if he has an adequate evidentiary record based on admissible evidence, put forth his suggestions of alleged weekly $480 cash withdrawals over the past twenty years[5] or Nadine Menendez's alleged

---

[5] The available bank records for Menendez's accounts reveal that over the seven-year records retention period, his rate of cash withdrawals was not this high.

"family's wealth" (Dkt. 290 at 5) as the purported innocent explanations for the hundreds of thousands of dollars of cash and the jury can decide whether to credit those proffered explanations. That is the proper remedy for what Menendez repeatedly calls "speculation," not preventing the jury from weighing competing inferences. Indeed, to the extent that Menendez's argument in this respect is (a) purely factual, (b) subject to dispute, and (c) appears to require him to call one or more witnesses, it would be particularly inappropriate to preclude the evidence on the ground he offers, because credibility is for the jury. *See, e.g.*, *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011); *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989).

Moreover, evidence of money or valuables Menendez and Nadine Menendez had— whether stored in a bank account or stashed around their home—is relevant to the charged crimes, even if not all of the cash or valuables can be linked directly to bribe payors, because its existence is probative of whether Menendez and his wife sought and obtained loans from Jose Uribe or Hana. The jury is entitled to consider whether, as Menendez appears to suggest, he and his wife had hundreds of thousands of dollars of preexisting cash and valuables on hand from savings and family wealth, yet asked for and accept purported loans from Uribe or Hana. (*See* Indictment ¶¶ 69-73.) In short, all of the cash and valuable items found in Menendez's home, and the other cash and valuables they had, are highly probative of both the bribery scheme and Menendez's and Nadine Menendez's conspiracy to obstruct and obstruction of justice.

**B.** **Photographs of Luxury Wristwatches Offered as Bribes to Menendez Are Admissible**

Menendez also seeks to prevent the jury from learning that, during the time period of the charged scheme, Daibes offered at least one high-end wristwatch to Menendez via an encrypted messaging application by sending Menendez photographs of a computer monitor displaying a

13

website showing several luxury watches for sale and asking, "How about one of these." (Dkt. 290 at 5.) This evidence is plainly admissible as direct evidence of the charged bribery offenses, which prohibit, among other things, "*offer[ing]* . . . anything of value to any public official" to influence an official act, and a public official "*demand[ing] [or] seek[ing]* . . . anything of value" in return for being influenced in the performance of an official act. 18 U.S.C. § 201(b)(1) & (2) (emphases added). The fact that the messaging application does not include an answer from Menendez is of no import, because the crime has been committed at the point of offer or demand; acceptance or receipt of the bribe is not required. These messages were a clear offer of a bribe, as they were sent two days before Daibes sent Menendez a link to a website tracking a resolution supportive of Qatar that was pending before Menendez as Chairman of the SFRC—*i.e.*, a request for an official act with respect to that resolution. (Indictment ¶ 58.) The offer also came just days after Menendez and Daibes attended a private event hosted by the Qatari government (S4 Indictment, ¶ 58), and the message itself—"how about one of these"—strongly suggests Menendez and Daibes had had a prior conversation regarding the topic of the watches. Similarly, this offer was several weeks before Menendez received a one-kilogram gold bar from Daibes following his trip to Qatar, strongly suggesting that Daibes ultimately paid Menendez not with the wristwatch but with at least one gold bar. (Indictment ¶¶ 58-59.) Daibes's attempts to wave away this damning sequence of events as simply "that it occurred in proximity to certain other events" (Dkt. 290 at 6) is unconvincing and in any event properly directed to the jury.

Nor, again, is the evidence unfairly prejudicial, much less so prejudicial that it should be precluded. Given that Menendez received literal gold bars worth far more than the watch offered

by Daibes, there is no appreciable risk that the jury is likely to be inflamed by two photographs of watches.  *See, e.g.*, *Roldan-Zapata*, 916 F.2d at 804.[6]

### C. **Menendez's Financial Disclosure Forms Are Admissible**

Menendez argues that evidence and testimony regarding his Senate financial disclosure forms—which failed to disclose many of the things of value received during the charged conduct (*see* Indictment ¶ 67)—should be excluded merely because he is not charged with submitting false forms.  (Dkt. 292 at 3-6.)  His attempt to preclude evidence of concealment and consciousness of guilt is contrary to the rules of evidence and should be rejected.

Under Menendez's narrow (and incorrect) reading of Rules 401 and 402, evidence that Menendez concealed hundreds of thousands of dollars received from co-conspirators seeking to influence or obtain official acts is irrelevant because he "has not been charged with violating any disclosure laws" and there "could" be an innocent explanation for the omissions.  (Dkt. 292 at 4.) This argument fails as a matter of both law and logic.

With respect to the law, "even where alternative inferences are plausible" (and here, they are not), it remains for the jury "to choose among competing inferences.'"  *United States v. Bouloute*, 185 F. App'x 102, 105 (2d Cir. 2006) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)); *see also, e.g.*, *United States v. Coppola*, 671 F.3d 220, 239 (2d Cir. 2012) ("Insofar as Coppola hypothesizes alternative sources for the monies paid, we are mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court." (internal quotation marks omitted)); *United States v. Cook*, 173 F. App'x 896, 898 (2d Cir. 2006)

---

[6] As the Indictment alleges, the offered watches had prices ranging from $9,990 to $23,990 (Indictment ¶ 58), whereas the price of a kilogram of gold at the time at which Nadine Menendez liquidated it was over $60,000 (*id.* ¶ 53.h).

(it is for the jury to consider, and accept or reject, "alternative interpretations of the evidence").

With respect to logic, there is no dispute that Menendez is not charged with a false statements offense for filing false forms, but he is charged with fraud offenses of which his failure to disclose these things of value is a direct component of the offense conduct. That is, Menendez is charged with both conspiring to commit and committing honest services wire fraud, which require that the Government prove Menendez's participation in a scheme to defraud that involved a material misrepresentation, false statement, false pretense, or concealment of fact. *See, e.g.*, Sand, *Modern Federal Jury Instructions*, Inst. 44-4. Menendez's failure to disclose these things of value is thus part of the charged offense conduct.

For this reason, omissions or misstatements on financial disclosure forms are frequently introduced as evidence in honest services wire fraud cases. *See, e.g.*, *United States v. Bruno*, 661 F.3d 733, 736-39, 745 (2d Cir. 2011) (evidence sufficient to sustain honest services wire fraud conviction where payments were disclosed in manner that concealed nature of *quid pro quo* arrangement); *United States v. Napout*, 332 F. Supp. 3d 533, 549 (E.D.N.Y. 2018) ("In the post-*Skilling* era, to prove a crime of honest services fraud, the government must prove that a defendant . . . knowingly made a material misrepresentation or omission to the person or entity to whom the duty was owed in furtherance of his receipt of the bribe or kickback."). For example, in *United States v. Percoco*, the public official defendant did later disclose publicly that he had received money from certain entities in a public filing, but did not disclose, of course, that the payments were made *in exchange for* official action. *See United States v. Percoco*, No. 16 Cr. 776 (VEC) (S.D.N.Y. Feb. 22, 2018) (Dkt. No. 583 at 5051-54). So too, in *United States v. Silver*, the defendant disclosed the amount of outside payments in public filings, but not *why* he was so

16

paid. *See, e.g.*, No. 15 Cr. 93 (VEC) (S.D.N.Y. July 27, 2018) (Dkt. 460 at 3). The Government is unaware of any honest services fraud case in which a defendant was permitted to prevent the jury from learning one of the ways in which that fraud was committed, and Menendez offers none.

But even if Menendez were not charged with crimes involving concealment or deceit as elements, that would still not somehow render irrelevant his omissions of cash, gold, and other benefits on his financial disclosure forms. To the extent he has an adequate and admissible basis, Menendez can present his arguments to the jury and it can decide whether the omissions on his financial disclosure forms are evidence of concealment and consciousness of guilt or, as he appears to suggest (Dkt. 292 at 4), the result of a mere misunderstanding. But Menendez is not entitled to prevent the jury from considering this plainly relevant evidence. *See, e.g.*, *United States v. Ash*, No. 22-1048-CR, 2022 WL 16955057, at *3 (2d Cir. Nov. 16, 2022) ("[Defendant] contends that the district court erred in overruling her objections to evidence of valuable benefits she received for being on the Board and her failure to disclose those benefits on her obligatory financial disclosure forms. This evidence was admissible as it tended to show motive and consciousness of guilt."); *United States v. Silver*, 184 F. Supp. 3d 33, 44-45 (S.D.N.Y. 2016) ("[A] rational juror could conclude that [defendant's] financial forms and disclosures to the press . . . were far from forthright and thus were evidence of consciousness of guilt."), *vacated and remanded on other grounds*, 864 F.3d 102 (2d Cir. 2017); *see also id.* at 53 n.10 ("How [defendant] filled out his financial disclosure forms was not, however, a 'collateral dispute' nor mere 'details.' . . . [T]he forms were relevant as circumstantial evidence of [defendant's] consciousness of guilt."); *United States v. Mangano*, No. 16 Cr. 540 (JMA), 2022 WL 65775, at *43 (E.D.N.Y. Jan. 6, 2022) (in bribery scheme, where financial disclosure form falsely disclosed certain bribe payments made to

defendant, via his wife, as her salary, "[defendant's] submission of this financial disclosure—an attempt to lull Nassau County and the citizens of Nassau County . . . from discovering [defendant's] bribery scheme—was an act in furtherance of that scheme"); *United States v. Sampson*, No. 13 Cr. 269 (DLI), 2015 WL 2066073, at *7 (E.D.N.Y. May 4, 2015) (admitting financial disclosure forms in obstruction of justice case because "Defendant's failure to report the Associate Transaction on his Senate Financial Disclosure Forms suggests that Defendant was using the money for an illicit purpose, *i.e.* the embezzlements. Therefore, the Senate Financial Disclosure Forms help to complete the government's story regarding the embezzlements and the resulting interference in a federal investigation.").

Indeed, the Government is unaware of any decision that has accepted the proposition that Menendez appears to advance, which conflicts with both uniform case law about the relevance of disclosures to show consciousness of guilt, and the Second Circuit's recognition that "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions." *United States v. Rosen*, 716 F.3d 691, 702 (2d Cir. 2013) (affirming denial of Rule 29 motion in honest services bribery prosecution where circumstantial evidence of *quid pro quo* included timing of payments to legislators, importance of official action to payor, and failure to disclose payments). Thus, "[i]n cases involving public officials, a trier of fact may 'infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.'" *Id.* (quoting *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011)); *see also United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) (jury can infer the existence of an illegal *quid pro quo* "from evidence of benefits received and subsequent favorable treatment, as well as from behavior

indicating consciousness of guilt").

Menendez turns the law on its head by claiming that disclosure form evidence "would create a prejudicial inference that he was hiding certain gifts, loans or assets because he believed them to be improper or unlawful." (Dkt. 292 at 4.) That is certainly an inference that the jury may draw—and it is well-supported—but there is nothing "prejudicial" about it other than the fact that it tends to incriminate the defendant. *Jimenez*, 789 F.2d at 171; *see also Sampson*, 2015 WL 2066073, at *7 ("Very little prejudice will result from the jury knowing that Defendant did not disclose financial information on his Senate Financial Disclosure Forms as such an omission is not more egregious than the charged criminal acts."). Menendez's reliance on an out-of-circuit district court decision, in lieu of the ample case law from this district and circuit, is telling. (*See* Dkt. 292 at 4-5 (citing *United States v. Terry*, No. 10 Cr. 390, 2011 WL 2149361, at *2 (N.D. Ohio May 31, 2011)).) While Menendez describes *Terry*'s holding as "excluding evidence of bribery defendant's failure to make required disclosures as likely to confuse jury," the court in fact precluded a proposed expert who was to testify regarding the Ohio judicial code's prohibition on *ex parte* communications, but recognized that the judicial code could be relevant in other circumstances "to demonstrate the defendant's knowledge of the law." *Terry*, 2011 WL 2149361, at *4-5. It noted that although "there are no parallels in the law with respect to *ex parte* communications," "there may be laws that parallel some aspects of the judicial code (i.e., bribery laws, *disclosure laws*, conflict laws)." *Id.* at *4 (emphasis added). That reasoning hardly assists Menendez.

And contrary to Menendez's suggestion that an expert is somehow required for this evidence (Dkt. 292 at 5-6), the forms generally speak for themselves. Indeed, such forms are

commonly offered in similar cases without an expert.  *See, e.g.*, *United States v. Silver*, No. 15 Cr. 93 (VEC) (S.D.N.Y. May 8, 2018) (Tr. 1528 *et seq.*); *United States v. Ash*, No. 19 Cr. 780 (LAK) (S.D.N.Y. Dec. 7, 2021) (Tr. 605 *et seq.*).  To be sure, the Government may call a witness who assists in operating the Senate disclosure regime to authenticate the forms and place them in context, including to show how Senators are trained on and made aware of the forms.  But this is not expert testimony.  *Cf., e.g.*, *United States v. Pounds*, 364 F. App'x 362, 364 (9th Cir. 2010) ("[T]he district court did not abuse its discretion when it permitted [the witness] to testify that someone who lived New Orleans but moved to California eleven months before Hurricane Katrina would not be eligible for FEMA disaster assistance. This testimony was rationally based on his perceptions as a FEMA employee, was helpful to determination of a fact in issue (the primary residence requirement) and was not based on specialized information within the scope of Rule 702."); *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011) (rejecting argument that "lender representatives should not have been allowed to testify about what their institutions would have done had they known that several representations in various loan applications were falsified" unless those representatives were qualified as experts).

In short, as Menendez appears to acknowledge (Dkt. 292 at 5), what principally distinguishes lay testimony from expert testimony is whether the witness is permitted to give an opinion.  *Compare* Fed. R. Evid. 602 *with* Fed. R. Evid. 702.  The Government does not intend task any witness to give an opinion about Menendez's financial disclosure forms or to opine on what they mean or do not mean.  That will be up to the jury.  In any event, even if the limited anticipated witness testimony were deemed expert testimony—and it is not—that would not entitle Menendez preclude the testimony, but merely to receive notice, which he effectively will, in any

event, in the form of 3500 material (with existing such material due one business day from today). And under no circumstance would it entitle him to the windfall of preclusion of his own financial disclosure forms.

Nor, finally, is there any basis to preclude this evidence under Rule 403. It is straightforward, non-sensational, and directly and highly probative of Menendez's consciousness of guilt and an element of multiple honest services wire fraud counts. Menendez's hyperbolic and undeveloped claim that he purportedly "would need to call numerous witnesses" (Dkt. 292 at 5) to respond to this evidence is not a basis for preclusion.

## D.  Hana's Lack of Registration Under the Foreign Agents Registration Act Is Admissible

As he did in his surplusage motion (Dkt. 143 at 59-61), which the Court orally denied yesterday, Hana seeks to preclude evidence that he did not register under the Foreign Agents Registration Act ("FARA"). (Dkt. 289 at 12-22.) As explained in the Government's opposition to the surplusage motion (Dkt. 180 at 175-76), the fact that Hana did not register publicly under FARA is far from "irrelevant" (Dkt. 298 at 13). On the contrary, Hana's lack of registration is evidence of his efforts to conceal his actions on behalf of the Government of Egypt—which went on for *years*—and is also important so the jury is not under the misimpression that Hana was a publicly-registered representative of or advocate for the Government of Egypt with whom Menendez or others purportedly believed it was appropriate to share sensitive information and field requests from Egypt. The Government, for example, intends to present evidence of the actions of certain registered agents of Egypt, and it is crucial that the jury be able to appreciate that certain interactions that might be regular if they were undertaken with a registered agent are highly unusual and suspicious to undertake with an unregistered one. Indeed, given that the jury will

21

otherwise learn of FARA with respect to the Section 219 count (and the conspiracy to violate Section 219 count, of which Hana is one of the charged defendants), there is a significant likelihood that the jury would otherwise have such a misimpression.

Contrary to Hana's suggestion (Dkt. 289 at 18-19), the evidence does not require a trial-within-a-trial on whether Hana was in fact required to register and therefore violated FARA. His conduct regarding Egypt will certainly be set forth in detail as part of the charged offenses, and the exceedingly brief testimony that he did not register under FARA will simply show that the actions he took on behalf of Egypt were not part of any publicly disclosed agency relationship for Egypt.

Hana's lack of FARA registration is also not inflammatory or unfairly prejudicial. Even if a juror were to believe his lack of registration was wrongful, is far less serious than the allegations of bribing a U.S. Senator. In any event, an appropriate limiting instruction can allay his concern that jurors may believe he is charged with a FARA violation or that his failure to register, in and of itself, proves him guilty of the offenses with which he is charged. *See, e.g.*, *Paulino*, 445 F.3d at 223 ("[T]o the extent there was any risk of unfair prejudice, the district court satisfactorily reduced that possibility with a thorough and carefully worded limiting instruction."); *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (noting the presumption that "juries understand and abide by a district court's limiting instructions").

### E. Menendez's Motion to Preclude Certain Evidence Concerning Business Benefits Obtained from Menendez's Official Acts Is Moot

Menendez seeks to exclude certain testimony and evidence he deems "speculative" regarding the reasons for (1) a Qatari company's investment in a New Jersey real estate project and (2) the monopoly given by the Government of Egypt to IS EG Halal Certified, Inc. (Dkt. 290

at 7-9.)  As with his other challenges to circumstantial evidence of the charged offenses, Menendez's attempt to preclude relevant and admissible evidence by repeatedly using the word "speculative" should be rejected.

As to the Qatar-related scheme, Menendez does not appear to contest the allegations in the Indictment that Menendez introduced Qatari Investment Company-1 to Daibes or the other actions that followed.  Menendez asks only that "[t]he Court . . . preclude the Government from eliciting testimony from witnesses who lack personal knowledge of the reasons for Qatari Investment Company-1's investment." (Dkt. 290 at 7.)  The Government is aware of the Rules of Evidence, and does not intend to offer such inadmissible testimony.  Indeed, the actions taken by Menendez and Daibes in connection with the real estate project—which involved Menendez making public statements praising Qatar for Daibes to send to a Qatari investor (and member of the Qatari royal family) who was considering an investment in Daibes's project (Indictment ¶¶ 55-57)—are expected to be shown primarily through text messages and other documentary evidence, not witness testimony (aside from summary witnesses who present the text messages and similar evidence).

Similarly, as to the IS EG Halal scheme, Menendez argues that testimony or evidence regarding the *reasons* the company was awarded a monopoly by Egypt should be precluded "unless such testimony is offered by a witness with personal knowledge of decisions made by the Government of Egypt." (Dkt. 290 at 7.)  Menendez further argues that such testimony from "[e]mployees of the United States Department of Agriculture ('USDA') or other federal agencies" would be inadmissible hearsay and should be excluded. *Id.*  Again, the Government does not plan to offer inadmissible hearsay.  Evidence of the monopoly and its role in the charged offenses are

expected to be introduced through documents (such as text messages between Hana and Egyptian officials) or knowledgeable witnesses, and the jury may properly be asked to infer from this evidence the "reason(s) why" the monopoly was granted. *See Mundy*, 539 F.3d at 157 ("what conclusions should, or should not, be drawn from" evidence is for the jury); *Badalamenti*, 1985 WL 3539, at *1; *Huezo*, 546 F.3d at 182; *Florez*, 447 F.3d at 155.

## F. **Evidence of Certain Fundraisers Is Admissible**

Menendez asks the Court to preclude "evidence of campaign donations—including campaign donations from current and former co-defendants" because they supposedly have "no bearing on the bribery schemes charged in the Indictment." (Dkt. 292 at 1.) He also specifically seeks to preclude "testimony of a campaign fundraising event that cooperating witness Jose Uribe hosted for the Senator," which Menendez claims "had nothing to do with the charged scheme, and we expect Uribe would not testify otherwise." (*Id.*)

The Government does not intend to offer in its case-in-chief evidence of campaign donations other than that of certain fundraisers hosted by Uribe and others such as Daibes, which are highly relevant to the background to and relationships among co-conspirators and intertwined with their corrupt relationships, even though Menendez is not charged with any *quid pro quo* exchange of an official act for a campaign donation. For example, the fundraiser hosted by Uribe—who was seeking official acts from Menendez—was where Uribe and Menendez first met, and was hosted by Uribe in order to develop the corrupt relationship with Menendez as part of his and Hana's efforts to disrupt the New Jersey Attorney General investigations, even if the corrupt *quid pro quo* with Menendez did not crystallize by the time of the fundraiser itself. Testimony about the fundraiser—such as the motivation behind the fundraiser, who was there, and what they

spoke about—is therefore integral to the jury's understanding of the timeline and relationships among the defendants and others. Indeed, without Uribe being able to explain how he met Menendez, and how Uribe and Hana sought to cultivate a corrupt relationship with him for their benefit, Uribe would have to testify in a disjointed and artificial manner, and the jury might—incorrectly—therefore assume that he was not being forthright. Menendez is not entitled to such a windfall. Similarly, certain witnesses may testify about a fundraiser for Menendez hosted by Daibes in fall 2018 as part of the timeline of relevant events and to explain the development of the relationship between Daibes and Menendez. This too is necessary to tell an integrated, comprehensible, and accurate story.

To be clear, the Government does *not* plan to argue that the funds raised for Menendez from the fundraisers were, standing alone, illegal bribes or otherwise criminal actions—and it has no objection to an appropriate limiting instruction—but it is plainly not the case that the fundraisers "had nothing to do with the charged scheme" (Dkt. 292 at 1) and therefore there is no basis for excluding such testimony and leaving the jury to wonder how key individuals met and how their relationship developed. *Cf. Williams*, 205 F.3d at 33-34 (affirming admission of prior act evidence involving co-conspirators "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed" (internal quotation marks omitted)); *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (other act evidence admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *Pipola*, 83 F.3d at 566 ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible

25

background information in a conspiracy case.").

### G. **Evidence Related to Menendez's Tax Returns Is Admissible**

Menendez seeks to preclude any reference to his tax returns because he claims what he did or did not report in his filings has no bearing on the charged crimes and is not evidence of consciousness of guilt. (Dkt. 293 at 8-11.) He is wrong on both counts.

As an initial matter, although Menendez tries to make the matter appear unbearably complicated and exceedingly onerous, the expected evidence of Menendez's tax returns would likely consist of one witness from the Internal Revenue Service, who would already be testifying about other matters, authenticating the tax returns and providing brief testimony regarding whether certain things were or were not disclosed in the returns. Alternatively, were the defendants to agree, this straightforward evidence could be offered via stipulation.

As discussed above, concealing ill-gotten gains in financial disclosures is frequently admitted as evidence of concealment and consciousness of guilt, as discussed above, and this applies equally to tax returns. *See, e.g.*, *United States v. Shah*, No. S4 19 Cr. 833 (SHS) (Dkt. 561) (Tr. 9) (S.D.N.Y. May 25, 2022) (denying defendant's motion to preclude evidence "that she did not disclose income to the IRS" at fraud and money laundering trial); *United States v. Shea*, S2 20 Cr. 412 (AT) (S.D.N.Y. May 6, 2022) (Dkt. 214) (denying defendant's motion to preclude evidence of defendant's failure to report income at fraud and money laundering trial because "[s]uch evidence tends to show that Defendant knew the funds he received were illegitimate and that he took pains to conceal them"); *United States v. Adelekan*, No. 19 Cr. 291 (LAP) (S.D.N.Y. Oct. 22, 2021) (Dkt. 393 at 488) (denying defense motion to preclude IRS testimony at fraud and money laundering trial regarding failure to file tax returns and report income because "the

testimony will be direct evidence of the concealment of the source of the funds"); *see also United States v. Avenatti*, No. 19 Cr. 374 (JMF) (S.D.N.Y. Jan. 13, 2022) (Dkt. 238) (Tr. 14) ("[I]f the proceeds were lawful, legitimate proceeds to which Mr. Avenatti was entitled, they would have presumably been income and he would have been required to report them to the IRS. The fact that he did not do so tends to rebut any claim that they were lawful and legitimate."). And it is particularly appropriate when a public official is charged with honest services fraud, as explained above. In short, the evidence is highly probative for multiple reasons, directly relevant to multiple counts, and straightforward.

Finally, particularly in the context of this case, which involves bribery and extortion schemes, there is no basis to think that evidence that Menendez failed to disclose certain income would be unfairly prejudicial within the meaning of Rule 403. As in other cases where such evidence has been admitted, there is nothing salacious or unfair about documentary evidence regarding a defendant's disclosure or non-disclosure of income demonstrating his own view of the proceeds of his crime. *See United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) ("Any arguable prejudice to [the defendant] was *de minimis:* it strains credulity to think that the jury might have believed [the defendant] innocent of transporting stolen goods, but voted to convict him anyway just because he failed to report income on his tax returns."); *see also United States v. Bergstein*, 788 F. App'x 742, 745 (2d Cir. 2019) ("The government properly introduced [the defendant's] tax returns to show that even though [he] maintained that his income was legitimate, shell companies under his control did not report or pay taxes on [the] income."); *United States v. Osarenkhoe*, 439 F. App'x 66, 68 (2d Cir. 2011) (approving admission of tax return evidence under Rule 404(b)). Moreover, as with certain other categories of evidence described above, the Government has no

objection to an appropriate limiting instruction, should the defendant request one.

## II.    The Defendants' Motions to Preclude Evidence of Their Financial Circumstances and Financial Consumption Patterns Should Be Rejected

Menendez, Nadine Menendez, and Hana all seek to preclude evidence of their financial circumstances (Dkt. 284 at 2-4; Dkt. 289 at 5-12; Dkt. 293 at 5-8), but this evidence is relevant as direct evidence, as evidence of their motive and intent, and inextricably intertwined with evidence regarding the charged offenses.

To the extent expensive items were offered or given to Menendez or Nadine Menendez by individuals seeking to influence official acts, those items are plainly evidence of the charged crimes. (*See, e.g.*, Indictment ¶¶ 43 (luxury car), 53(a) (recliner), 58 (luxury watch).) Similarly, evidence of high-end meals with co-conspirators is intertwined with evidence of the relationships between the parties, the official acts being promised, and the bribes given in return. (*See, e.g.*, Indictment ¶ 44(e) (dinner with champagne during time when Uribe was seeking intervention in New Jersey prosecution).)

Other types of financial evidence are also relevant to the crimes charged. Menendez's and Nadine Menendez's income (and Nadine Menendez's limited work history and lack of employment when the scheme began), for example, put in context the $60,000 luxury vehicle, as well as various home improvements she wanted, and provide a motive for engaging in the *quid pro quo* transactions. Similarly, the Government expects to present evidence regarding Nadine Menendez's desire for and receipt of a luxury handbag from Daibes. Her desire for luxury automobiles or accessories, made known to those charged with bribing Menendez through her, is thus highly relevant evidence of her and Menendez's motives to commit the charged offenses. *See, e.g.*, *United States v. Shah*, No. S4 19 Cr. 833 (SHS) (S.D.N.Y. May 25, 2022) (Dkt. 561)

(Tr. 43) (granting government's motion to admit evidence of defendant's spending on luxury items and explaining that, "[i]f the government has evidence that she is living above her means and therefore there is a motive here to engage in fraud, that's very traditional [under] *United States v. Daddario*, 662 F. App'x 61, 63 (2d Cir. 2016) and many other cases").

Similarly, the fact that Nadine Menendez's residential mortgage was in arrears and her residence was subject to at least potential foreclosure provides another compelling motive for her and Menendez to agree to monetize Menendez's official position.[7] *See, e.g.*, *United States v. Li*, 133 F.3d 908, 1997 WL 76149, at *1 (2d Cir. 1997) ("evidence of [defendant's] debt . . . was properly admissible as evidence of motive"); *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981) ("[A] defendant's belief that he is in financial difficulty is admissible to show motive, and not unduly prejudicial."); *United States v. Hernandez*, 588 F.2d 346, 349 (2d Cir. 1978) ("[the Second Circuit] has long recognized the admissibility of [financial condition evidence] to establish motive in money-related offenses"); *United States v. Shyne*, No. S4 05 Cr. 1067 (KMK), 2007 WL 1075035, at *34 (S.D.N.Y. Apr. 5, 2007) ("Details of a defendant's financial history are often relevant to the motive of a defendant to commit a crime, especially if that crime involves pecuniary gain."); *cf. United States v. Chalhoub*, 946 F.3d 897, 909 (6th Cir. 2020) ("Evidence about the correlation between Chalhoub's income and expenditures is probative, given that it helps establish Chalhoub's motive for performing [medical] procedures that may not have been necessary."). In

---

[7] For this reason, the cases that Nadine Menendez complains relate only to indebtedness are readily applicable here. (*See* Dkt. 284 at 3-4 (the cases "involve easily distinguishable evidence of a defendant's *indebtedness* admitted as evidence of motive to commit a crime of enrichment" (emphasis in original).) Nadine Menendez was behind on her mortgage and yet also wanted a luxury vehicle, and her inability to afford such things provides her and Menendez with motives to help sell Menendez's influence so others would help pay for the things she could not otherwise afford.

any event, that the residence's mortgage was in arrears is part of the story of the bribery scheme, because certain of the bribes was to pay the mortgage. (See Indictment ¶ 32.) Nadine Menendez is not entitled to prevent the jury from being presented with a cohesive story about bribes themselves.

As to Hana, the Government expects to introduce evidence of his striking *change* in fortunes—from someone whose house was foreclosed to someone making millions of dollars thanks to the monopoly granted to his company by the Government of Egypt. This financial turnaround is proof not just of motive but also that his sudden success was attributable not to any track record of business acumen but rather to the boon handed to him by the Egyptian officials for whom he arranged and sought to arrange official acts from Menendez—and thus also proof that it was in Menendez's and Nadine Menendez's interest that Hana continue to enjoy a lucrative monopoly because he otherwise would not be in a position to provide valuable goods to them. Again, these facts are part of the story of the charged offenses.

The defendants suggest that this type of evidence risks appealing to class prejudice or improperly introducing character evidence. (Dkt. 284 at 3; Dkt. 289 at 6; Dkt. 293 at 8.) But the Government has no intention of arguing that the defendants were wealthy and therefore the jury should distrust or dislike them (and indeed, Menendez and Nadine Menendez were not wealthy). Nor does the Government intend to offer evidence of a taste for more expensive goods devoid of a connection to the very persons and actions at issue in this case. Rather, as described above, the Government intends to demonstrate the defendants' motive for engaging in the charged offenses and that their increasing wealth or possession of certain expensive goods was a result of or intertwined with the charged offenses—often provided to them by the very persons who bribed

them.  To preclude this evidence would be to preclude part of the story of the charged crimes themselves.

For this reason, the cases cited by the defendants are readily distinguishable.  For example, unlike in *United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) (cited by Hana, *see* Dkt. 289 at 6), it *is* relevant here "how [the defendants] acquired the money" they used to fund their lifestyles—*i.e.*, through bribery or a monopoly granted by a foreign government benefiting from Menendez's official actions.  And, unlike in *Hatfield*, it is *not* "entirely speculative whether [the defendant's] funding for his 'lavish' personal spending came from the alleged scheme or from his sizable pre-existing fortune." *Id.*  Rather, the evidence of Hana's previous financial difficulties shows that he did not have a "pre-existing fortune" and that his revenue from the scheme involving the halal monopoly is what allowed him to lavish gifts on Menendez and Nadine Menendez.

Just as inapposite is *United States v. Cassese* (cited by Menendez, *see* Dkt. 293 at 8), in which evidence of wealth was introduced in support of a particular motive theory—that the defendant had committed securities fraud because he was angry about a failed deal—that the court found to be "inappropriately submitted" and "unsupported by the evidence" as it was based on the testimony of a single witness who was not even sure what, if anything, the defendant was upset about.  290 F. Supp. 2d 443, 457 (S.D.N.Y. 2003) (granting Rule 29 motion in part because unsupported motive theory "resulted in the introduction of irrelevant and highly prejudicial evidence regarding Cassese's wealth"), *aff'd*, 428 F.3d 92 (2d Cir. 2005).  Here, the motive theory is supported by the evidence, such as text messages showing that Nadine Menendez wanted others who were simultaneously seeking access to Menendez to pay for her and Menendez's luxury vehicle or home furnishings.

Finally, as with the defendants' other arguments, a limiting instruction can address any potential concerns of unfair prejudice. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006).

**III.    Menendez's and Nadine Menendez's Motions to Preclude Evidence Regarding Use of Her Consulting Company to Collect Payments for Menendez's Influence on Business Matters Should Be Denied**

The Government may, depending on the progress of trial and the arguments raised by the defendants, offer limited evidence in its case-in-chief of payments made by a laboratory company (the "Laboratory Company") to Nadine Menendez's purported consulting company, Strategic International Business Consultants, and of actions (or lack thereof) taken by Nadine Menendez and Menendez on the Laboratory Company's behalf. This evidence would be offered both as direct evidence and, in the alternative, pursuant to Rule 404(b) as proof of the defendants' motive, intent, common scheme or plan, absence of mistake, and lack of accident. Menendez's and Nadine Menendez's motions to preclude this evidence (Dkt. 293 at 11-14; Dkt. 284 at 4-6) should be denied.

**A.    <u>Factual Background</u>**

As this Court previously stated, the CEO of the Laboratory Company (the "Laboratory Company CEO") was among the "alleged beneficiaries of the bribery scheme." *United States v. Menendez*, S2 23 Cr. 490 (SHS), 2024 WL 912210, at *7 (S.D.N.Y. Mar. 4, 2024). Beginning in or about 2020, a former associate of Hana, who had met Menendez and Nadine Menendez while working for Hana during the course of the charged offenses, connected Menendez and Nadine Menendez with the Laboratory Company CEO. The Laboratory Company was a biomedical testing company that provided COVID-19 testing services. Beginning in late 2020, after meeting Nadine Menendez based on this introduction, the Laboratory Company CEO paid Nadine

Menendez in exchange for Menendez's efforts to pressure and advise various New Jersey city officials to use the Laboratory Company to perform COVID-19 testing services in their municipalities, including providing government space and using government resources to publicize the Laboratory Company's testing services. From 2021 through April 2022, the Laboratory Company paid Nadine Menendez, through checks to her company Strategic International Business Consultants, as well as directly, over $100,000—allegedly for services Nadine Menendez had provided (such as purported assistance with paperwork). The Laboratory Company's payments to Strategic International Business Consultants, along with the bribe checks from IS EG Halal referenced in the Indictment (Indictment ¶¶ 33-34), and payments derived from a relationship with another company that was also seeking business from New Jersey municipal officials, made up the only significant inflows of funds into the bank account of Strategic International Business Consultants during the relevant time period.

**B. Discussion**

The foregoing evidence is relevant and admissible for multiple reasons.

*First*, at least some evidence regarding the Laboratory Company likely will be inextricably intertwined with evidence regarding the charged offenses, depending on how the Government responds to the arguments the defendants choose to emphasize at trial. *See, e.g.*, *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). For example, the relationship between the Menendezes and the Laboratory Company was a direct outgrowth of the charged bribe scheme involving Hana, beginning when Hana first directed his associate to perform home improvement services for Nadine Menendez.[8] Similarly, depending on the arguments raised by the defendants at trial—such

---

[8] Hana first directed his associate to do so on the day that Menendez first called Official-2.

as if the defense claims that Nadine Menendez's consulting company was a legitimate company performing actual consulting work—the inflows from the Laboratory Company into the Strategic International Business Consultants bank account may be needed to tell the full story of the purported consulting company and explain its nature and the purposes for which the Menendezes used it.

*Second*, even if not direct evidence, the evidence is admissible to show, among other things, motive and intent, common scheme or plan, and absence of mistake or accident with respect to Menendez's and Nadine's Menendez's actions as charged. *See* Fed. R. Evid. 404(b)(2). Specifically:

- Evidence of Menendez's attempted influence of municipal leaders to obtain business for the Laboratory Company—which then paid Nadine Menendez—is admissible to prove Menendez and Nadine Menendez's motive and intent with respect to the charged offenses. As with the charged offenses, Menendez used his official position to further his personal financial interest through payments to Nadine Menendez, and Nadine Menendez correspondingly demonstrated her intent to monetize her relationship with Menendez.

- The evidence is admissible to show Menendez's and Nadine Menendez's common scheme or plan, both in how Menendez collected things of value through Nadine Menendez and in how Nadine Menendez's consulting company operated. Just as in the charged offenses, Menendez pressured other government officials to benefit persons who were paying Nadine Menendez. And just as in the charged offenses, he did so in exchange for purported consulting payments paid to the same

34

consulting company—a consulting company that he helped her set up during the course of the charged offenses. Indeed, the very business purpose of the consulting company was to collect such illicit payments; rather than receiving compensation for any substantial consulting or other work that Nadine Menendez was performing, the business of Strategic International Business Consultants was to receive payments that were made in exchange for Menendez's official acts. Proving this common scheme of plan, using not only common means and methods but the same purported consulting company, is a classic and permissible Rule 404(b) purpose.

- Finally, the evidence demonstrates absence of mistake or accident. Menendez and Nadine Menendez carried on this strikingly similar course of conduct, in using Nadine Menendez's consulting business to collect substantial payments in exchange for little or no legitimate work. Instead, they used the consulting business to collect funds in exchange for Menendez's attempts to use his official position to pressure other officials. This is fatal to any suggestion that the conduct in the charged offenses was undertaken by some sort of mistake or accident, such as through Menendez's ignorance that the persons he was seeking to benefit were paying Nadine Menendez, or that Menendez was unaware of certain payments to Nadine Menendez's consulting company.

Nor is there a sufficient basis to preclude this evidence under Rule 403. The evidence is straightforward, non-sensational, and highly probative of Menendez's and Nadine Menendez's motive, intent, common scheme or plan, absence of mistake, and lack of accident. There is no risk that, despite receiving a limiting instruction, this evidence will elicit a separate, heightened

response from the jury that would prevent the jury's fair assessment of the evidence. *See, e.g.,* *Williams*, 205 F.3d at 34 (perceiving "no undue prejudice under Rule 403 [where] the evidence did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction"); *Roldan-Zapata*, 916 F.2d at 804 (evidence not unfairly prejudicial because it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").

In addition, the proffered evidence would not materially lengthen or complicate the trial. The Government anticipates that to the extent it presents evidence regarding the Laboratory Company, that evidence would consist principally of a moderate number of electronic communications and a small number of phone records and financial records, likely introduced through a summary witness; brief fact testimony from a witness the Government already expects to call on other matters; and, if necessary, brief testimony from another witness primarily to provide context for the communications and financial transactions.

## IV.   The Motion to Exclude Menendez's Prior Case is Moot

The parties agree that evidence concerning Menendez's prior criminal case should generally not be presented to the jury (*see* Dkt. 293 at 3-5), so this motion is moot.

The limited exception raised by the Government in its April 5, 2024 motions *in limine* is "if Menendez were to choose to testify, or otherwise opened the door, it might be proper for the Government to cross-examine him or to introduce appropriately limited evidence concerning Menendez's prior federal criminal case." (Dkt. 291 (Gov't Mot.) at 10-11.)  For example—as explained in the Government's Rule 404(b) notice to the defendants—it might be appropriate to cross-examine Menendez regarding his prior actions, and/or his knowledge of the relevant criminal

laws, to demonstrate, among other things, absence of mistake or accident.  However, given that both parties agree evidence of the prior case should generally not be introduced at trial, and there is no need for the Court to rule at this time.

## **CONCLUSION**

For the foregoing reasons, the defendants' motions *in limine* should be denied.

Dated: New York, New York
          April 12, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    s/ Daniel C. Richenthal
       Eli J. Mark
       Daniel C. Richenthal
       Paul M. Monteleoni
       Lara Pomerantz
       Catherine Ghosh
       Assistant United States Attorneys
       (212) 637-2431/2109/2219/2343/1114